UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 06-256 (RMU) |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MICHAEL POTTS | : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in aid of sentencing.

**I.    BACKGROUND**

The defendant was charged in a one-count information with Theft of Government Property, in violation of 18 U.S.C. § 641. On September 12, 2006, the defendant pled guilty to this offense. At that time the defendant admitted to the following:

Michael Potts was employed at the United States Government Printing Office ("GPO") from September 2000 to August 2006. During his employment at GPO, Potts worked for the following divisions: Mail List Branch, Human Capital Office, Plant Operation, and Office Finance Administration. GPO is located at 732 North Capitol Street, NW, in Washington, DC. GPO is a legislative agency, and is the federal government's primary centralized resource for gathering, cataloging, producing, providing and preserving published information in all its forms. GPO provides Congress, the courts, and government agencies a set of centralized services to enable them to easily and cost effectively produce printed documents according to a uniform set of Federal government specifications. GPO also has offered these publications for sale to the public and made them widely available at no cost through the Federal Depository Library

Program.

Between October 2002 and July 2006, the defendant improperly used four different GPO account codes to order a total of 4,430 printer ink cartridges ("cartridges") from the GPO General Store and the GPO Self Service Store. These cost codes were assigned to the following GPO divisions: 1) Documents Sales Service Mail List Branch; 2) Human Capital Office Information Dissemination/Executive Service; 3) Human Capital Office Information Technology/Human Capital; and 4) Human Capital Office Customer Service. Only certain GPO employees are permitted to use these cost codes, and they are allowed to do so only to order supplies for use by the employee's assigned division.

The defendant placed orders and received cartridges in the following ways: on some occasions, the defendant used GPO computers to access the GPO mainframe, through which he placed orders for cartridges at the GPO General Store. These cartridges were then either delivered directly to the defendant, or the defendant would go in person to the GPO General Store on the first floor of GPO to pick up the cartridges. Each time the defendant received cartridges from the GPO General Store, he initialed or signed a Picking Ticket, which listed the transaction number, the number of cartridges received, the cost of the cartridges, the make and model of the cartridges, the date and time of the transaction, and the cost code charged for the cartridges. In other instances, the defendant would go to the GPO Self Service Store, located on the sixth floor of GPO, and take cartridges directly from the store shelves. Each time the defendant took cartridges from the Self Service Store, he initialed or signed a Self Service Store Receipt, which listed the number of cartridges received, the cost of the cartridges, the make and model of the cartridges, the date and time of the transaction, and the cost code charged for the

cartridges. To order the cartridges, the defendant used cost codes that he was not supposed to be accessing.

Each time the defendant ordered a printer cartridge using an account code, the GPO division associated with that code was charged the cost of the cartridge. The total loss suffered by GPO as a result of the defendant's theft of the printer ink cartridges was $111,025.89. The defendant resold the majority of these cartridges to King Pawn, a pawnshop located at 4504 Annapolis Road, in Bladensburg, Maryland. Between 2003 and 2006, the defendant sold to King Pawn cartridges stolen from GPO on over three hundred separate occasions.

In some instances, the defendant provided stolen cartridges to his wife, Karren Potts. Karren Potts was employed at GPO from 1984 until September 15, 2006. Between October 24, 2003, and August 23, 2005, Karren Potts sold a total of 229 cartridges to King Pawn. Each of these cartridges was stolen from GPO by the defendant.

On June 30, 2006, the defendant met with GPO Office of the Inspector General ("OIG") Special Agents Hugh D. Coughlin and Walter B. Martin IV. The defendant was provided with a Non-Custodial Advice and Consent Form, and an acknowledgment of union representation. He waived his rights and answered the agents' questions at that time. During the interview the defendant admitted to taking between $2,000 and $3,000 worth of cartridges from GPO. The defendant claimed that he used the cartridges for computer classes for underprivileged children that he taught at his church. The defendant admitted that he obtained the cartridges using his GPO ID card, and said that he signed receipts for each of his "purchases." The defendant told the agents that he felt justified in taking the cartridges from GPO because the monetary cost to GPO paled in comparison to the billions of dollars President Bush was spending in Iraq. When

pressed for information about the church he claimed to be providing with the cartridges, the defendant admitted that he had stolen the cartridges for personal profit. He told the OIG agents that he sold the cartridges to people at shopping malls, parking lots, and Home Depot parking lots. However, as noted above, this statement was false, as the defendant actually sold the cartridges to King Pawn in Bladensburg, Maryland. The defendant also claimed that he had sold all of the remaining cartridges, and that he no longer had any in his possession. Yet on July 19, 2006, the defendant sold three cartridges to King Pawn.

When the defendant stole each of the cartridges from GPO, he did so knowing that the cartridges belonged to the United States, and with the intent to deprive GPO of the use or benefit of the cartridges.

## II.    SENTENCING CALCULATION

### A    Statutory Minimums and Maximums

Pursuant to 18 United States Code § 641, the offense of Theft of Government Property carries a maximum sentence of 10 years imprisonment, a period of 3 years of supervised release, and a fine of up to $250,000.

### B.    Sentencing Guidelines Calculation

The Guidelines calculation utilized in the Presentence Report ("PSR") calculates the defendant's total offense level at 12. See PSR ¶ 29. (This calculation contemplates a two level departure for acceptance of responsibility.) The PSR calculates the defendant's criminal history as Category I. See PSR ¶ 32. Therefore, the PSR calculates the guideline range for the defendant at 10 to 16 months. See PSR ¶ 83.

**III.     GOVERNMENT'S RECOMMENDATIONS**

      A.     Application of the Federal Guidelines post-Booker

In <u>United States v. Booker</u>, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in <u>Blakely v. Washington</u>, 124 S. Ct. 2531 (2004).  As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory, Title 18, United States Code, Section 3553(b)(1).  <u>Booker</u>, 125 S. Ct. at 756. However, the Court expressly refused to invalidate the Guidelines in their entirety.  To the contrary, the Court upheld the remainder of the Guidelines as the most appropriate benchmark for informing courts as to the most reasonable sentence for a particular defendant who has committed a particular crime. Indeed, it remains the case that if the sentencing court imposes a sentence that is outside the range as set forth in the Guidelines, the Court must state in a written order of judgment and commitment the specific reason for the imposition of a sentence different from that described in the Guidelines.  <u>See</u> 18 U.S.C. Section 3554(c)(2).  The sentence will then be subject to review by courts of appeals for "reasonableness."  <u>Id.</u> at 769.

In <u>Booker</u>'s wake, this Court must continue to resolve disputed questions of fact and law and correctly calculate a defendant's sentence under the existing Sentencing Guidelines.  <u>See</u> Fed. R. Crim. P. 32(i)(3)(B) (court must rule on unresolved objections to the Presentence Report or determine that resolution not necessary to sentencing).  "The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing."  <u>Booker</u>, 125 S. Ct. at 767 (citing 18 U.S.C. Sections 3553(a)(4)&(5) (Supp. 2004)). In light of this mandate – and the continued requirement of written explanations for sentences

5

that fall outside of the range called for by the Guidelines and the new standard of "reasonableness" review – it is plain that a sentence within the Guidelines, while not required, is reasonable per se. Not only is a sentence within the Guideline range reasonable per se, but it also accommodates the goal, endorsed by both Congress and the Supreme Court, of meting out fair and uniform sentences.

      The Guidelines, aiming to achieve the uniform and appropriate treatment of like crimes, represent the distillation of two decades of careful study of sentencing practices across the country, and correlate as well to the varying severity of crimes as defined by Congress. The Guidelines, consisting of offense characteristics and various grounds for departure, address the considerations relevant to sentencing, as articulated in 18 U.S.C. Section 3553(a), such as "the nature and circumstances of the offense and the history and characteristics of the defendant"; "the need for the sentence imposed -- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

      Indeed, the Sentencing Commission formulated the Guidelines only after initially canvassing prior sentencing practice and attempting to identify and assign weights to all the factors – both aggravating and mitigating – that judges traditionally used in determining an appropriate sentence. See United States Sentencing Comm'n, Supplementary Report on the

Initial Guidelines and Policy Statements 16-17 (1987); see also 28 U.S.C. Section 994(m) (requiring Commission to "ascertain the average sentences imposed . . . prior to the creation of the Commission"); Comprehensive Crime Control Act of 1984, S. Rep. No. 98-225, at 168 (Commission should produce a "complete set of guidelines that covers in one manner or another all important variations that commonly may be expected in criminal cases").  Moreover, since the Guidelines were adopted, the Sentencing Commission has continued to study district court and appellate sentencing decisions and to "modify its Guidelines in light of what it learns." Booker, 125 S. Ct. at 766; see id. at 767 (Sentencing Commission will continue "collecting information about actual district court sentencing decisions . . . and revising the Guidelines accordingly").

      It thus remains true that, absent unusual circumstances, the sentence in a criminal case should fall within the Guideline range as determined by this Court.  Each Supreme Court Justice in the various opinions in Booker recognized the express national policy goals, as articulated by Congress, that sentences be uniform across the country, to the extent possible, and that sentences be based on the offender's actual conduct and history.  See, e.g., id. at 761 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); id. at 759 (same) ("Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction."); id. at 783 (dissenting opinion of Stevens, J.) ("The elimination of sentencing disparity, which Congress determined was chiefly the result of a discretionary sentencing regime, was unquestionably Congress' principal aim."); id. at 789 (dissenting opinion of Scalia, J.) ("the primary objective of the Act was to reduce sentencing disparity.").  Since the Guidelines

currently represent the only extant benchmark to encourage uniformity and thus the only tool to implement Congress' vision of sentencing uniformity and fairness, Guideline range sentences are currently the only mechanism available to implement Congress' basic statutory goals.

Booker, to be sure, departs from the prior practice of automatic reversal that would have accompanied the failure to sentence a defendant within the Guidelines. Such a sentence will now be reviewed instead for its "reasonableness." See Booker, 125 S. Ct. at 764. Nevertheless, the Guidelines -- resulting as they do from years of study of sentencing practices, crime statistics, national crime policy, and consideration of the factors that inform sentencing, see 18 U.S.C. Section 3553(a) – provide the most concrete yardstick against which to measure what would be unreasonable. Booker not only prevents courts from substituting their individual judgment about the appropriateness of the Guidelines range without explaining with specificity their reasoning, Booker also continues to subject the explanation of the decision to sentence outside of the correctly calculated range to a court of appeals reasonableness review. See 18 U.S.C. Section 3553(c) (mandating consideration of the Guidelines); 18 U.S.C. Section 3553(c)(2) (mandating written explanations for imposing a sentence outside of the applicable Guideline range); 18 U.S.C. Section 3742(f)(1) (mandating court of appeals to set aside a sentence imposed as a result of an incorrect application of the Guidelines); 18 U.S.C. Section 3742(f)(2) (mandating court of appeals to set aside a sentence outside the Guidelines range when the district court fails to provide a required statement of reasons in the judgment and commitment order).

Fidelity to the Guidelines best accomplishes the purpose of fair and consistent sentencing and should occur absent unusual circumstances. This is so, said the court in United States v. Wilson, 350 F. Supp. 2d 910 (D. Utah, 2005) – the day after Booker was decided – because the

Guidelines represent the product of an expert commission, that has studied the sentencing process at great length, under the specific mandate of Congress, to fashion recommended sentences that carry out the purposes defined by Congress.  The resulting Guidelines, Wilson held, plainly reflect the public's will, as expressed by their democratically elected representatives, in that Congress has repeatedly approved of the Guidelines or acted to adjust them to congressional preference.  Wilson further observed that guided sentencing appears to have had a positive impact in deterring criminal conduct throughout the country, and thus serves the purpose of deterrence as well as punishment and fairness.  For all of these reasons, Judge Cassell determined that "the court will give heavy weight to the Guidelines in determining an appropriate sentence.  In the exercise of its discretion, the court will only depart from those Guidelines in unusual cases for clearly identified and persuasive reasons." Id. at 912.  A non-Guidelines sentence would, in the ordinary or usual case, unreasonably thwart legislative intent – in particular, the overriding concern with uniformity and the prevention of unfair disparities for similarly-situated defendants.

In this case, as explained further below, no unusual circumstances exist that warrant an exception to the preference for guideline sentencing.  Therefore, the government respectfully recommends that the Court sentence the defendant within the Federal Guidelines range calculated in the Presentence Report.

    B.    <u>Basis for Government's Sentencing Recommendation</u>

The defendant's behavior in this case shows a history of exploiting the slightest trust placed in him and denying culpability until the moment it becomes disadvantageous to do so.  The crime for with the defendant has been convicted, and the manner in which he responded

9

when confronted about this crime, paint a picture of a man who has established a propensity for deceit and dishonesty.[1]

The defendant did not commit a one-time, spur-of-the-moment crime. Instead, he executed well-thought-out thefts time and again. He stole over 4,000 printer cartridges over a four-year period. He was acutely aware of the cost to GPO, as each time he received cartridges from either the GPO General Store or the GPO Self Service Store, he initialed or signed a document which listed the number of cartridges received, and the cost of the cartridges. Furthermore, defendant's thefts consisted of a number of steps and took considerable foresight. Not only did the defendant have to place orders for many of the cartridges he stole, but he then had to figure out how to get them out of the GPO building without raising suspicion. And once he finally had the cartridges out of the building, he had to decide how and where to fence them, and had to transport the cartridges to the pawn shop. In fact, the defendant traveled over three hundred times to King Pawn to sell stolen cartridges.

It is also important to note that defendant did not stop stealing voluntarily; he only ceased this particular scheme when his conduct was discovered by GPO OIG agents.[2] Absent this

---

[1] Indeed, defendant's dishonesty and deceit continued even after he pled guilty in this case. While pending sentencing, the defendant tested positive for cocaine on five separate occasions. See PSR ¶ 52. When confronted by the presentence report writer, the defendant claimed that he used cocaine only once during this period, and that the rest of the positive tests are the result of that one usage. See PSR ¶ 53. However, the government consulted with Pretrial Services, and, according to an agency employee, cocaine is eliminated or excreted from the body within five days. Given that the defendant's positive drug tests were on five separate dates, each one week apart, his claim that he used cocaine only once is wholly incredible.

[2] In fact, the defendant was so bold as to continue with his criminal behavior after it was discovered, as evidenced by his sale of three stolen cartridges to King Pawn after being confronted by GPO OIG agents.

intervention, it is entirely possible that defendant would have continued stealing for many more months or even years. As a direct result of his long term theft scheme, the defendant has critically undermined the trust GPO places in its employees.

On June 30, 2006, the defendant was confronted by OIG agents. Instead of telling the truth, the defendant lied to the agents. And he did not lie just once. In line with the pattern of repeated deceit established by his thefts, the defendant lied again and again. First he claimed that he stole only between $2,000 and $3,000 worth of cartridges. Then he claimed he was using the cartridges to help underprivileged children at his church. When agents pressed for information about this church, the defendant admitted that he had stolen the cartridges for personal profit. He then told the OIG agents that he sold the cartridges to people at shopping malls, parking lots, and Home Depot parking lots. However, this statement was another falsehood, as the defendant actually sold the cartridges to King Pawn in Bladensburg, Maryland. The defendant also told agents that he had sold all of the remaining cartridges, and that he no longer had any in his possession. Yet, subsequently, on July 19, 2006, the deendant sold three more cartridges to King Pawn.

Given the defendant's long term-thievery and his dishonesty, a sentence at the high end of the applicable Guideline range is needed to reflect the seriousness of the defendant's offense and to promote respect for the law.

IV.     **RESTITUTION**

As set forth supra in §I, defendant stole $111,025.89 worth of cartridges from GPO.[3] Accordingly, the Court should order the defendant to pay restitution in the amount of $111,025.89.

V.      **CONCLUSION**

Wherefore, the government respectfully requests that the Court sentence the defendant to 16 months of incarceration.

Respectfully submitted,

JEFFREY A. TAYLOR
United States Attorney

_____
Catherine K. Connelly
Assistant United States Attorney
Major Crimes Section, Mass. Bar No. 649430
555 4th Street, N.W.  #4844
Washington, DC 20001
Phone: 616-3384
Fax: 353-9414

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I caused a copy of the foregoing to be served upon the attorney for the defendant, Gary Sidell, this 30th day of November, 2006.

_____
Catherine Connelly
Assistant United States Attorney

---

[3] Karren Potts is jointly and severally liable for $6,197 of that amount, and the government has requested that she pay restitution in that amount.